IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| ALLSTATE INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:11-CV-04567-AT |
| | : | |
| CAROL SINIARD, as surviving Spouse | : | |
| and Executor of the Estate to JOHN | : | |
| RAYMOND SINIARD, deceased, | : | |
| BRANDON CHARLES CONFORTI and | : | |
| GREAT AMERICAN CONSTRUCTION | : | |
| COMPANY, | | |
| | | |
| Defendants. | | |

## ORDER

This declaratory judgment action is before the Court on Plaintiff's Motion for Summary Judgment [Doc. 33].

## I. BACKGROUND

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.2d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to non-moving party). This statement does not represent actual

findings of fact.  *In re Celotext Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

This case centers on the question of whether Defendant Brandon Charles Conforti ("Brandon Conforti") was an employee of Defendant Great American Construction Company ("Great American") at the time of an auto accident that killed John Raymond Siniard.  Brandon Conforti has testified that Carl Conforti, his father and the owner of Great American, employed him periodically over the months leading up to the accident and that he therefore had permission to drive the company vehicle involved in Siniard's death.  Carl Conforti has testified that he fired Brandon Conforti approximately six weeks prior to the accident, and that Brandon therefore knew he did not have permission to drive the vehicle at issue. Since the testimony of Brandon and Carl Conforti differs so sharply, the Court will refer to their testimony extensively in the following factual recitation.

The parties agree that, at some point during the summer of 2010, Brandon Conforti worked for his father Carl Conforti at Great American.  (Def.'s Statement of Undisputed Material Facts ("SMF") ¶ 1; Pl.'s Resp. SMF ("Resp. SMF") ¶ 1.) According to Brandon Conforti, he had been working with his father off and on for his entire life.  (B. Conforti Dep. 11:10-14.)   In March 2010, Brandon was released from prison after serving approximately 56 months of a five-year sentence.  (*Id.* 11:19-23.)  Brandon testified that he began working for his father "almost immediately" after his release and continued working "all the way up

until . . . September [2010] — whenever this accident happened." (*Id.* 11:24-12:1.) Brandon testified that he was involved in a range of work at Great American, including remodeling, demolition work, and trash transportation. (*Id.* 12:4-7.)

During the time that Brandon worked for Great American, the company owned a Ford E-250 van. (*Id.* 12:20-23.) Brandon testified that both he and an employee named Danny Parrish drove the van. (*Id.* 12:20-13:11.) Carl named Brandon as an authorized operator of the van on his Allstate insurance policy, (SMF ¶ 17; Resp. SMF ¶ 17 (denying only that Brandon was fired from Great American prior to the accident)), and Brandon was still listed as an operator at the time of the underlying accident. (*Id.*) According to Brandon, he was only authorized to drive the van on company business and on company time.[1] (B. Conforti Dep. 13:12-17.) However, he testified that he was authorized to drive the van home "if it was getting late and my vehicle was at the shop . . . and I needed to take the vehicle home that night so I could get up early and just head straight to work or get gas or something." (*Id.* 13:22-14:1.) Brandon's father Carl also testified that he would allow Great American employees to take company vehicles home for the evening "if it was closer to their house than them having to come back." (C. Conforti Dep. 15:4-5.)

Brandon testified that he has no memory of his father firing him from his work at Great American at any time during the summer of 2010. (B. Conforti Dep. 14:20-15:7, 17:16-22.) He explained that his father gave him a job at Great

---

[1] Brandon also testified that he interpreted his father's decision to name him as an operator on the Allstate policy as a sign that he was authorized to drive the van. (B. Conforti Dep. 41:18-21.)

American following his release from prison in March 2010 because he was enrolled in a substance abuse rehabilitation program and was required under the guidelines of the program to have a job.[2]  (*Id.* 17:18-22, 49:3-14.)   He described his employment at Great American as fluid, with no set end date but with no expectation that he would continue working past the completion of a given job. Responding to a question from Plaintiff's counsel about any indication he received from Carl Conforti regarding the end point of his work, Brandon stated:

> Ma'am, to me, he was more of a, well, son, you know you are eventually going to have to veer off.  You can't stay with me your whole life and work with me your whole life.  You are going to have to get off and do your own thing. . . .  He has never come to me and said, "Brandon, you are about to be done working here.  You need to find another job."[3]

(*Id.* 15:11-20; *see also id.* 18:21-19:3.)

He later testified that his work schedule would vary by the week: some weeks he would work seven days, and others he would work one day.  (*Id.* 77:2-6, 95:2-8.)  Although his schedule was erratic, Brandon testified that he considered

---

[2] Brandon was living in a community house as part of the rehabilitation program at the time of the accident.  (*Id.* 49:7-10.)

[3] Brandon also testified that he had been told at various points by his father not to return to the Great American warehouse:

> Q. Do you recall your dad ever telling you that you were not allowed to come to the Great American warehouse at any point?
> A. Yes, ma'am.  He does it all the time.
> Q. So you don't dispute that he told you –
> A. No, ma'am, I don't dispute at all.  I mean –
> Q. That he told you you couldn't come to the warehouse?
> A. He tells me that two or three times a week.  I mean it's a father and son relationship.

(B. Conforti Dep. 22:9-20.)

> Brandon testified that one such conversation took place "toward the end of [the summer 2010]."  (*Id.* 26:17-24.)

4

himself to be an employee of Great American up until September 13, 2010.  (*Id.* 40:11-15.)

Brandon testified that the last work he remembers performing for Great American was one week prior to the accident in this case, when he worked on a project constructing a playhouse at his father's home.  (*Id.* 21:10-20, 51:20-52:6.) He worked for approximately 20 hours on the project with another employee and was paid for his work as if he had been working for Great American.  (*Id.* 21:24-22:8, 24:17-23, 52:7-23.)   Generally, Brandon was paid for his work at Great American by check as an independent contractor.  (*Id.* 51:1-17; C. Conforti Dep. 16:2-5.)  Brandon testified that he finished work on the project two or three days before the accident.   (B. Conforti Dep. 83:6-16.)   Prior to his work on the playhouse, he had been assigned to a Great American project in the Atlanta area. (*Id.* 83:17-84:2.)  Brandon could not recall the date of that project, but testified that it had been close in time to the playhouse project.  (*Id.* 84:1-2.)

On September 13, 2010, Brandon arrived at the Great American warehouse at approximately 12:00 or 1:00 p.m.  (*Id.* 27:4-6, 30:8-10.)  He was dropped off by a friend.  (*Id.* 81:23-82:1.)  He testified that he went to the warehouse with the intention of taking the Ford E-250 van to "detail it and do everything — clean the back of it up, get everything organized for him, because I was trying to take the initiative and take that step in showing him that I am trying to grow up and be a better person." (*Id.* 28:13-18.)  He intended to take the van to a car wash near the warehouse.  (*Id.* 36:13-16.)   Brandon testified that he had detailed the van

approximately three or four times between March 2010 and September 13, 2010, and never immediately following a project.  (*Id.* 94:1-6, 100:8-15, 106:3-13.)  He had been paid for detailing the van on those occasions as if he were "on the clock."  (*Id.* 94:7-9.)  On some of these occasions, Brandon's father had not specifically instructed him to clean the van.  (*Id.* 94:10-19.)  Brandon testified that he had never been disciplined or otherwise rebuked for detailing the van in the past.  (*Id.* 100:11-23.)

No one had asked him to come to work on September 13, but Brandon testified that he intended to "surprise" his father by cleaning the vehicle.  (*Id.* 29:3-7.)  He believed that Great American would benefit from his efforts and that "the company would be happy" with him for taking the van to the car wash.  (*Id.* 56:18-24.)  He testified at one point that he had no expectation of being paid for cleaning the van and never noted his "clock-in" time that day; instead, he wanted to show initiative and "try to hold my position" in the company.  (*Id.* 91:1-13, 96:11-15.)  However, in a later answer, he testified that he was "hoping" he would be paid.  (*Id.* 103:23-104:6.)  He also wanted to impress his father on a personal level.  (*Id.* 91:17-23.)

At the warehouse, he encountered Tina Dukes, Great American's secretary.  (*Id.* 27:4-6, 31:14-15.)  The primary set of keys to the van was generally kept in a black tray next to a computer at the warehouse.  (*Id.* 78: 11-12.)  However, on that day, Brandon looked in the tray and saw that the keys were not there.  (*Id.* 79:19-23.)  According to Tina, Brandon asked to have the keys to the company van.

(Dukes Aff. ¶ 2.)  Tina asserts that she "knew that Brandon . . . no longer worked for the company and was not allowed to drive company vehicles, so I told him that he did not have permission to take the van and could not have the keys to the van.  (*Id.* ¶ 3.)  However, according to Brandon, he never asked Dukes for permission to take the van keys,[4] and Dukes never prohibited him from driving the van away.  (*Id.* 31:15-32:15, 102:18-103:3.)  He testified that he merely asked Tina for the location of the key, to which Tina responded, "I don't know where the key is."  (*Id.* 102:8-10.)  Following this conversation, Brandon found a hide-a-key magnetically attached to the underside of the van.  (*Id.* 33:9-11.)  Brandon testified that the key had been underneath the van "ever since I started working for [my father], ever since he got the vehicle."  (*Id.* 33:19-20.)  Brandon understood that the key was placed underneath the van in case a Great American employee was locked out.  (*Id.* 44:11-19.)  He did not assume that an employee needed permission to use the hide-a-key.  (*Id.* 46:21-25, 47:12-14.)  On at least two occasions prior to September 13, 2010, Brandon had seen Danny Parrish, the van's primary driver,[5] use the hide-a-key after locking himself out of the vehicle.  (*Id.* 42:25-43:12, 45:22-46:12.)  Brandon did not know who had placed the key

---

[4] On this point, Brandon hedged later in his testimony:
       Q. Why didn't you ask Tina for the keys to the vehicle?
       A. I'm going to be honest with you.  I can't recall if I did or didn't.
       Q. Okay.
       A. It's been so long ago.
(*Id.* 77:17-22.)
       At yet another point, however, Brandon stated unequivocally once again that he "didn't ask [Tina] for the keys." (*Id.* 78:7-8.)
[5] Carl Conforti confirmed in his deposition testimony that Danny Parrish was the van's primary driver.  (C. Conforti Dep. 11:14-25.)

underneath the van, but assumed that his father was aware of its existence. (*Id.* 33:12-17.) Danny Parrish was the employee who originally informed Brandon of the key's location. (*Id.* 85:1-4.)

Brandon testified that he never had an explicit conversation with his father about whether he could take the van on the day of the accident.[6] (*Id.* 54:15-20.) Likewise, according to Brandon, he never had a conversation with Tina Dukes during which she told him not to take the van. (*Id.* 68:22-69:3.) He testified that he stayed at the warehouse for approximately forty-five minutes to one hour before taking the van to get it cleaned. (*Id.* 67:1-5.) Based on the totality of his experiences at Great American, he believed that he was allowed to take the van that day in order to detail it.[7] (*Id.* 54:21-55:3.)

---

[6] Brandon's deposition testimony is muddled on this point. The following is an initial exchange between Brandon and counsel for Allstate:

> Q. If your father testified that he got on the phone with you that day and told you that you could not take the work van, is he mistaken?
> A. I don't know, ma'am. I have no idea.
> Q. You have no recollection –
> A. No, ma'am.
> Q. – of speaking with your father.
> A. No, ma'am.

(B. Conforti Dep. 32:23-33:5.)

Finally, in an exchange with counsel for the Siniards, Brandon said he was "never told I could or couldn't use [the van]." (*Id.* 54:13-14.)

However, Brandon would later strongly suggest that his father never told him he could not take the van:

> Q. In fact, [your father] told you you couldn't have the work van; didn't he?
> A. In fact, he said nothing to me about having no work van period. . . . He never said I could have it or I couldn't have it.
> Q. If he says that he told you that you couldn't have it, is he mistaken?
> A. No, ma'am, he wouldn't be mistaken if he told me he didn't – if he did say that I couldn't have it. Why would I take it if he said I couldn't have it?

(*Id.* 35:17-36:4.)

[7] This point, too, is muddled in Brandon's deposition. At a later point, he testified that he did not know "if it was okay [to take the van]" on the day of the accident. (*Id.* 55:24-25.) However, the Court construes this answer as a present-day observation, i.e. that Brandon was not sure on

Brandon testified that, after taking the van from the warehouse, he drove for approximately three to five minutes before falling asleep at the wheel.  (*Id.* 68:12-17.)  At some point after falling asleep, he crashed the van into a vehicle carrying John Siniard.  (*Id.*)  The accident woke him up, and he pulled into a Conoco gas station, surveyed the damage, and fled the scene.  (*Id.* 68:12-69:4.)  Later that evening, Brandon was jailed on drug charges for illegal possession of Xanax.  (*Id.* 73:14-20, 86:16-22.)  He admitted to using drugs following the accident but testified that, prior to the accident, he had not used drugs or alcohol since July 16, 2010.  (*Id.* 87:23-88:3, 97:5-98:4.)  Later, he was served a warrant for felony hit-and-run at the Cobb County Jail.  (*Id.* 73:14-22.)  He was never charged with stealing the van, although his father did indicate at some point that he would press charges against Brandon for theft.  (*Id.* 69:23-70:17.)

Carl Conforti's version of the events leading up to and including the date of the accident is almost entirely different from his son's version.  Like his son, Carl testified that, at the time of the accident, Great American had two vehicles, a Ford E-250 van and a Ford F-150 truck.  (C. Conforti Dep. 9:1-7.)  Carl testified that, following his son's release from prison March 2010, "I told him that if he kept his act together, I would employ him."  (*Id.* 9:21-22.)  Carl acknowledged at his deposition that he listed Brandon as an operator of the van on his Allstate insurance policy.  (*Id.* 19:17-20.)  He testified that "[w]e put him on there so if he had to go get something, he could.  (*Id.*)  For example, Carl explained that

the date of his testimony if his father actually wanted him to take the van on the day of the accident, notwithstanding the evidence that he had permission to do so.

Brandon was authorized to drive the van while employed at Great American "to go get material and stuff." (*Id.* 56:21-22.)

According to Carl, at some point during Brandon's employment with Great American, his job performance declined. (*Id.* 20:10-21.) On a few occasions, Carl, testified, he sent his son home from work, telling him "something's going on, I know it, I can see it in you."[8] (*Id.* 20:17-19.) Carl strongly suggested in his testimony that he began to suspect his son of using drugs. (*Id.* 60:11-23.) Finally, Carl alleges that he fired his son from Great American. (*Id.* 21:3-20.) He recalled that he fired his son approximately four to six weeks prior to the accident. (*Id.*) He alleged that, following the firing, he gave his son "odd jobs" to do at his house. (*Id.* 21:21-22:2.) However, according to Carl, Brandon never worked for Great American after his employment was terminated. (*Id.* 22:3-5.) Additionally, following the firing, Carl alleges that he told Brandon he was not allowed to drive Great American's vehicles, and that Brandon understood the prohibition. (*Id.* 44:7-16.)

On September 13, 2010, Carl alleges that he received a call from Tina Dukes informing him that Brandon had arrived at the warehouse. (*Id.* 22:15-20.) According to Carl,

I was on a job and my secretary calls me, Tina, she says, "Brandon's

---

[8] Carl testified that, among the issues he had with Brandon over the years, both professionally and personally, was that his son would steal from him. (*Id.* 48:19-49:6.) However, he testified that he was not concerned in 2010 that Brandon would steal from him when he gave him a job with Great American, and that he could not recall Brandon ever stealing a vehicle or taking a vehicle without permission. (*Id.* 50:12-15, 52:8-11, 54:4-12.)

here.  He looks all messed up.  He wants the keys to the van or the truck."  And I said, 'Absolutely not.  Keep them in the lock box."  She goes, "He's making me nervous because you can tell he's out of it."

(*Id.*)

Carl alleges that he

got [Brandon] on the phone . . . [and] said, "Brandon, you need to leave the office or I'm going to call the police."  So he [Brandon] left the office and about 15 minutes later, he comes back in all dirty.  His hands were dirty.  He's washing his hands and Tina asked him what he was doing.  He goes, "I was just looking around the van, looking around the trucks."  And she said okay.  I told Tina – she felt uncomfortable.  I told her to go ahead and lock the office up and leave, and that's what she did.

(*Id.* 23:21-24:5; *see also id.* 40:3-11.)

Carl noted in his testimony that the keys to the two vehicles were in a lock box at the warehouse and stated that he told Tina "to keep the keys in the lock box and to unlock it[.]"  (*Id.* 23:23-24.)  Carl testified that he was only aware of two sets of keys to the company van, one of which was located in the lock box and one of which Carl kept with him.  (*Id.* 24:10-13, 25:2-3.)

Later in the evening on September 13, Carl received a call from his wife informing him of the accident.  (*Id.* 24:25-25:1.)  When he arrived at an apartment complex where Brandon had driven following the accident and from where Brandon was arrested for possession of Xanax, the police showed him a key Brandon had used to drive the van that "wasn't like a regular Ford key.  It didn't have the black on it. . . .  I said, 'I don't know where he got that from.'"  (*Id.* 28:8-11.)  Carl later reiterated at his deposition that he was not aware of the

existence of this third key prior to the date of the accident.  (*Id.* 28:23-25, 29:15-17, 66:2-4.)   He noted Brandon's statement that Danny Parrish had placed the key underneath the vehicle, but stated that he asked Danny about the key and Danny denied knowledge of it.  (*Id.* 68:12-14.)

At the time of the accident, the company van was still insured under the Allstate policy that had named Brandon as an authorized operator.   The policy states as follows:

**BUSINESS AUTO COVERAGE FORM**

\*\*\*\*\*\*\*\*\*\*

**SECTION II-LIABILITY COVERAGE**

**A. Coverage**

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from the ownership, maintenance or use of a covered "auto".

\*\*\*\*\*\*\*\*\*\*

> We have the right and duty to defend any "insured" against a "suit" asking for such damages or a "covered pollution cost or expense".   However, we have no duty to defend any "insured" against a suit seeking damages for "bodily injury" or "property damage" or a "covered pollution cost or expense" to which this insurance does not apply. We may investigate and settle any claim or "suit" as we consider appropriate. Our duty to defend or settle ends when the Liability Coverage Limit of Insurance has been exhausted by payment of judgments or settlements.

**1.     Who Is An Insured**

The following are "insureds":

**a.**     You for any covered "auto".

**b.**   Anyone else while using with your permission a covered "auto" you own, hire or borrow except:

    **(1)**   The owner or anyone else from whom you hire or borrow a covered "auto." This exception does not apply if the covered "auto" is a "trailer" connected to a covered "auto" you own.

    **(2)**   Your "employee" if the covered "auto" is owned by that "employee" or a member of his or her household.

    **(3)**   Someone using a covered "auto" while he or she is working in a business of selling, servicing, repairing, parking or storing "autos" unless that business is yours.

    **(4)**   Anyone other than your "employees", partners (if you are a partnership), members (if you are a limited liability company), or a lessee or borrower or any of their "employees", while moving property to or from a covered "auto".

    **(5)**   A partner (if you are a partnership), or a member (if you are a limited liability company) for a covered "auto" owned by him or her or a member of his or her household.

**c.**   Anyone liable for the conduct of an "insured" described above but only to the extent of that liability.

**d.**   Any organization, other than a partnership or joint venture, over which you maintain ownership or in which you hold a majority interest. This provision applies only if there is no similar insurance provided to that organization.

**e.**   Any organization you acquire or form after policy inception, other than a partnership or joint venture, over which you maintain ownership, or in which you hold a majority interest. Coverage under this provision does not apply;

    (1)   If there is similar insurance provided to that organization; or

    (2)   To "bodily injury" or "property damage" that occurred before you acquired or formed the organization.

**f.**     Any person or organization that you are required to name as an additional insured under the terms of a written job contract, or by written insurance requirements executed prior to any covered "loss" or claim. This protection only applies if the person or organization is liable for the conduct of an "insured" and only to the extent of that liability.

(SMF ¶ 15.)

Carl acknowledged at his deposition that, on the date of the accident, Brandon was still named on the Allstate policy as an operator of the company van. (*Id.* 31:1-2.)  He explained that the company would often delay removing terminated employees from the insurance policy, although the company generally tried "to get a person removed from the Allstate policy . . . after they're terminated[.]"  (*Id.* 31:3-7.)

After the accident, Carl contacted Allstate to set up an insurance claim for the damage to his van. (*Id.* 32:6-8.)  On the morning after the accident, Carl filed a police report stating that the van had been stolen. (*Id.* 35:11-17.)  However, there is no indication in Carl's deposition as to whether he pursued these charges. Carl stated that he could not recall any other occasion on which Brandon took the company van to get it cleaned. (*Id.* 41:6-8.)

On July 5, 2011, Carol Siniard filed the Underlying Lawsuit against Brandon Conforti individually and as agent of Great American.  (SMF ¶ 18.) Carol Siniard alleged that John Siniard suffered personal injuries, pain and suffering, and medical and other expenses as a result of Brandon Conforti's actions on September 13, 2010. (*Id.* ¶ 19.)  Carol Siniard also alleged that she

sustained various damages as a result of the accident.  (*Id.* ¶ 20.)  On December 29, 2010, Allstate sent Brandon Conforti a Reservation of Rights letter reserving its right to deny coverage for Siniard's claims.  (*Id.* ¶ 21.)  Allstate filed the present action on December 29, 2011, seeking a declaration as to its liability for coverage of Siniard's claims in the Underlying Lawsuit.  (*Id.* ¶ 22.)

## II.    DISCUSSION

### A.    *Motion for Summary Judgment*

#### i.  *Standard of review*

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56.  The substantive law applicable to the case determines which facts are material.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). "The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Counties in State of Ala.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citations and punctuation omitted). The Court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (11th Cir. 1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. *Fitzpatrick v.*

*City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.  *Id.*  If the moving party makes such a showing, it is entitled to summary judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact.  *Id.*

When the non-moving party bears the burden of proof at trial, however, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim.  *Id.*  Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case.  *Id.*  The non-moving party must then respond with sufficient evidence to withstand a directed verdict motion at trial. FED. R. CIV. P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994).

### ii.  Permission to use

Allstate argues in its Motion for Summary Judgment that Great American's Allstate policy does not provide coverage for damages found in the Underlying Lawsuit because Brandon Conforti did not have permission to operate the company van on the day of the accident.  (Br. Supp. Mot. Summ. J. at 12.)

Georgia courts apply an objective "reasonable person" standard in evaluating whether a driver's use of an automobile was "permissive" for purposes of establishing insurance liability.  *Allstate Insurance Company v. Spillers*, 579 S.E.2d 876, 878 (Ga. Ct. App. 2003).  Specifically, the Court must determine whether there is sufficient evidence in the record to create a jury question as to

whether a reasonable person would determine he had permission under the circumstances to use the van on the date of the accident. *See E. Raymond Smith, Inc. v. Allstate Ins. Co.*, 194 S.E.2d 339, 341 (Ga. Ct. App. 1972) ("[T]he jury could have found that a reasonable man would have understood the use here to be within the scope of permission as formed both by past patterns of use and new, slightly ambiguous limitations. The jury was entitled to consider all the circumstances because they, in effect, gave definition to the scope of permission." (citing *Am. Emp'rs Ins. Co. v. Johns*, 1778 S.E.2d 207, 211 (Ga. Ct. App. 1970))).

In *Spillers*, a driver was involved in a car accident resulting in damage. Randall Spillers, the plaintiff and driver, had purchased the vehicle involved in the accident tin 1995. *Id.* at 877. Spillers subsequently fell behind in making his car payments and Spillers's father agreed to refinance the car in order to avoid repossession. *Id.* Under the agreement, Spillers's father would make Spillers's car payments and Spillers would repay his father directly. *Id.* The car title remained in Spillers's name. *Id.*

Following the refinancing, the car was listed as an insured vehicle under an Allstate insurance policy held by Spillers's grandmother. *Id.* The policy defined an "insured person" as "(a) you, (b) any resident, and (c) any other person using [the insured auto] with your permission." *Id.* The policy defined "you" and "your" as the policyholder and the policyholder's resident spouse. *Id.* The Mustang was kept at Spillers's grandmother's house, where Spillers's father also lived. *Id.* Spillers lived next door to his father and grandmother and had his own

set of keys to the Mustang, and Spillers's father and grandmother knew that Spillers often drove the car from his grandmother's house to an auto shop behind his trailer to work on repairs.  *Id.*  Although his father and grandmother never gave Spillers express permission to drive the car, they never told him that he was unauthorized to drive it, even after Spillers developed a drinking problem and began experiencing memory loss and impaired judgment.  *Id.*

On March 11, 1999, Spillers collided with another vehicle as Spillers was driving the Mustang on a pubic road to a friend's house.  *Id.*  He stated that he was not entirely certain where he was headed when he began driving but intended to go to his friend's garage to perform repair work on the car.  *Id.*

Allstate sued for declaratory judgment to determine whether it was liable for coverage under the terms of Spillers's grandmother's insurance policy.  The Georgia Court of Appeals held that "the pertinent inquiry under the Allstate policy was an objective one to determine whether the owner or one in legal possession of the car gave the user permission to use it."  *Id.* at 878 (internal quotation marks omitted).  "In other words, "[t]he relevant inquiry [is] not whether Spillers . . . had a reasonable belief that he could use the Mustang for the purpose for which he used it, but whether a *reasonable person could conclude under the circumstances* that the use of the Mustang fell within the scope of the permission granted by the policyholder."  *Id.* (first and third alterations in original) (emphasis in original).

On the basis of this objective inquiry, the Georgia Court of Appeals held

that a reasonable person could have concluded that Spillers had permission to use the Mustang on the day of the accident.  *Id.*  First, the court stated, title to the vehicle was in Spillers's name.  *Id.*  Second, Spillers had the keys to the car, which he obtained with permission, and drove the car often to work on repairs.  *Id.* at 878-79.  Finally, there was no evidence that Spillers had ever been reprimanded by his family for taking the Mustang, to make repairs or for any other purpose.  *Id.* at 879.

Although Defendants argue otherwise, this case is not on all fours with *Spillers*.  First, Brandon Conforti's name was not on the title of the Great American van involved in the subject accident.  Second, Brandon did not have his own set of car keys to the van.  Instead, he found a magnetized hide-a-key underneath the van and used that key to take the vehicle from Great American's warehouse.  Third, there is some suggestion in Carl Conforti's testimony that Brandon obtained this key without Great American's permission, perhaps by copying the primary key on his own and without his father's knowledge.[9]

Nevertheless, viewing the evidence in the light most favorable to Defendants, a reasonable person could conclude that Brandon Conforti's use of the van in this case was permissive.  First, Brandon was still listed as an authorized operator under the Allstate policy on the day of the accident.  At his

---

[9] Carl Conforti testified that he was unaware the hide-a-key existed prior to the accident and that Danny Parrish, the driver Brandon identified as the employee whom he had seen use the key in the past, also denied knowledge of the key.  (C. Conforti Dep. 68:12-14.)  Carl's testimony about what Danny told him is inadmissible hearsay and cannot be considered here.  *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999).  Furthermore, Plaintiff has not introduced an affidavit or sworn testimony from Parrish.

deposition, Carl Conforti testified that "[i]t would be reasonable for a person who had been added on to the policy . . . to believe that they were allowed to drive the work van" so long as Carl authorized them to do so.  (*Id.* 14:9-14.)   Carl also testified that Great American generally removed an employee's name from the Allstate policy after the employee was terminated.[10]   (*Id.* 30:19-25.)      As Brandon's name was not removed prior to the accident, and as Plaintiff has produced no evidence indicating that Brandon was ever given termination papers, a reasonable person could conclude that Brandon had the same authorization to operate the van on the day of the accident as he had throughout his employment at Great American.   Second, on at least three prior occasions, Brandon had taken the van to be cleaned, and had not been reprimanded for doing so.   Prior use without reprimand can give rise to an objectively reasonable impression of permissive use.   *Spillers*, 579 S.E.2d at 879.   Third, Brandon accessed the van by using a key that, according to him, he had seen the primary van driver use on at least two prior occasions.   The fact that a primary driver accessed the van in a particular manner could lead a reasonable person to conclude that any authorized driver may access the van in that manner.   At trial, the origin of the hide-a-key, and the primary driver's prior use of that key, may be in dispute.   However, given the conflicting testimony of Brandon and Carl

---

[10] Carl acknowledged that the company "kind of drug our feet sometimes" on removing a terminated employee's name from the policy.  (C. Conforti Dep. 30:23-24.)  However, Brandon remained on the policy even though Juan Flores, another Great American employee, was removed on August 13, 2009, (Doc. 1-1 at 71), around the same time Carl Conforti purports to have terminated his son.  The fact that Brandon remained listed as an authorized operator on the policy even as Flores was removed could indicate that Brandon was still a Great American employee in August 2009.

Conforti, the issue is appropriately left for a jury to resolve.

Of course, Brandon's prior use of the van would be irrelevant if, as Carl Conforti contends, Brandon had been fired approximately four to six weeks prior to the accident. However, Brandon directly contradicts his father's contention. According to Brandon, he had worked with another of his father's regular employees on a construction project at his father's home mere days before the accident. Brandon testified that he had been paid for his work on this project as if he had been "on the clock" for Great American and worked for approximately 20 hours. (B. Conforti Dep. 21:24-22:8, 24:17-23, 52:7-23.) Brandon also testified that, on another date close in time to the accident, he had worked for Great American on a construction project in Atlanta. (*Id.* 83:17-84:2.) Brandon acknowledged that at some point during the summer, his father had told him to find another job or to go to the unemployment office because the business's work was getting slow. (*Id.* 52:18-21.) However, according to Brandon, such conversations occurred often between father and son, and Brandon would regularly be called back to work at Great American after hearing that he needed to find other employment. Indeed, Brandon had worked for approximately 20 hours "on the clock" in the week prior to the accident. Thus, even if Carl told Brandon at some point during the summer that he could no longer work at Great American, the totality of the circumstances of Brandon's employment would indicate to a reasonable person that he was still a Great American employee on the day of the accident, that he was still permitted to use the van for company

purposes, and that he was therefore permitted to take the van to be cleaned at a nearby carwash, as he had done in the past.

Finally, although Carl Conforti has testified that he spoke with his son on the day of the accident and specifically told him not to take the van, Brandon disputes that such a conversation ever took place. Brandon's testimony is at points difficult to follow, and at one point he stated that he could not recall whether he spoke to his father by telephone at the warehouse on the day of the accident. (B. Conforti Dep. 32:23-33:5.) However, at other points, Brandon indicated that he did not speak with his father by phone that day, and testified unequivocally that his father never at any point told him he could not take the van. (*Id.* 35:17-36:4, 54:13-14.) Likewise, Brandon testified that he never asked Tina Dukes for permission to take the van that day, and that Tina never expressly forbade him from doing so. (*Id.* 31:15-32:15, 102:18-103:3.) Viewing this evidence in the light most favorable to Defendants, a reasonable factfinder could conclude that neither Brandon's father nor Tina Dukes expressly prohibited Brandon from taking the van on the day of the accident. At trial, the factfinder may determine that Brandon's story is less credible than Tina's and his father's. However, it would be inappropriate for the Court to make such credibility determinations. [11] *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).

---

[11] Allstate argues that Brandon Conforti's testimony is self-contradictory and that the Court must therefore eliminate the favorable portions of his testimony. (Br. Supp. Mot. Summ. J. at 18-19.) Under *Prophecy Corp. v. Charles Rossignol, Inc.*, 343 S.E.2d 680 (Ga. 1986),

In sum, this case is sufficiently analogous to *Spiller* to deny Allstate summary judgment.  Brandon Conforti was listed as an authorized operator on the Allstate policy on the date of the accident, took the van for a purpose he had fulfilled in the past without reprimand, and accessed the van keys in the same manner as had the van's primary driver.  Brandon and Carl Conforti disagree on a number of key issues in this case, specifically, whether Brandon was terminated prior to the accident and whether Carl told Brandon on the day of the accident not to take the van.  However, it should be left to the factfinder, not the Court, to make credibility assessments that would be critical to determining the objective

---

> [I]f on motion for summary judgment a party offered self-contradictory testimony on the dispositive issue in the case, and the more favorable portion of his testimony was the only evidence of his right to a verdict in his favor, the trial court must construe the contradictory testimony against him.  This being so, the opposing party would be entitled to summary judgment. . . .  Once the trial court has eliminated the favorable portions of the contradictory testimony, it must take all testimony on motion for summary judgment "*as it then stands*, and construe it in favor of the party opposing the motion in determining whether a summary judgment should be granted."

*Id.* at 682 (quoting *Chandler v. Gately*, 167 S.E.2d 697, 704 (Ga. Ct. App. 1969)).

The Court notes that *Prophecy* articulates a state procedural rule and is thus inapplicable to this Court's standard of review at summary judgment.  *Hana v. Plumer*, 380 U.S. 460, 465 (1965) (holding that federal courts sitting in diversity cases are bound by state substantive law and federal procedural law).  Even if *Prophecy* did apply, the Court has reviewed Brandon Conforti's deposition testimony and concludes that it is not self-contradictory.  Although Brandon at times makes statements that may appear contradictory in a vacuum, these statements are better understood as responses to different questions when viewed in context.  For example, Brandon stated that he "did not have permission" to take the work van on the day of the accident.  (B. Conforti Dep. 38:20-21.)  However, this was in response to the question, "Nobody told you you could take the work van that day; correct?" and following a long line of questioning during which counsel for Allstate repeatedly asked him whether he had permission to take the van and to which Brandon repeatedly responded that he believed he had permission. (*Id.* 38:16-17.)  Viewed in context, Brandon's response is most appropriately construed as affirming counsel's suggestion that no one had explicitly told him he could take the van that day.

Although there are other examples of muddled testimony in Brandon's deposition, as the Court has noted in its recitation of facts, none of these examples is so egregious as to constitute self-contradiction.  Viewed in context, Brandon's answers are at worst evidence of bad memory.

reasonableness and permissive use issue. *E. Raymond Smith, Inc.*, 194 S.E.2d at 341; *Am. Emp'rs Ins. Co.*, 178 S.E.2d at 211.

Allstate also argues in the alternative that, because Brandon Conforti failed to timely answer Allstate's Complaint, he has effectively admitted Allstate's allegations. (Br. Supp. Mot. Summ. J. at 16.)  Allstate claims that, due to his default, Brandon "effectively admitted that he was not insured under the Policy and did not have permission to use the Vehicle on the date of the accident." (*Id.*)

In *Frow v. De La Vega*, 82 U.S. 552 (1872), the Supreme Court addressed the impact of one defendant's default in a multi-defendant case.  The Court held that district courts should delay entering judgment against the defaulting party until the action has been adjudicated on the merits as to the non-defaulting defendants.  *Id.* at 554.  The Court reasoned that, absent this rule, "there might be one decree of the court sustaining [one charge against the defaulting defendant], and another decree disaffirming the said charge." *Id.*  The Court found such an incongruity "unseemly and absurd, as well as unauthorized by law." *Id.*  In later years, the *Frow* rule has been extended to accrue to a defaulting defendant the benefits of a non-defaulting defendant's successful motion to dismiss or motion for summary judgment.  *See, e.g. Barnes v. Boyd*, 8 F. Supp. 584 (S.D. W. Va. 1934), *cert. denied*, 294 U.S. 723, *aff'd on other grounds* 73 F.2d 910 (4th Cir. 1934); *Davis v. Nat'l Mortgagee Corp.*, 349 F.2d 175 (2d Cir. 1965); CHARLES ALLEN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2690 (1998) .

Even if Brandon Conforti is in default, his testimony is still in evidence in this case.  Accordingly, the remaining non-defaulting Defendants may use this testimony as the basis for their opposition to Allstate's Motion for Summary Judgment.  Likewise, as Allstate seeks declaratory judgment as to all Defendants on the same legal and factual basis, the Court will not enter summary judgment as to Brandon Conforti while denying summary judgment as to the remaining non-defaulting Defendants, nor will it deem Brandon's default as contradicting his deposition testimony.  Any other result would undercut the rationale of *Frow* and its progeny.

For these reasons, the Court therefore **DENIES** Allstate's Motion for Summary Judgment.

A.    *Motion for Default Judgment*

Allstate has also filed a Motion for Default Judgment as to Brandon Conforti.  As the Court has already explained, it will not enter judgment against a defaulting defendant before an action is adjudicated on the merits as to the non-defaulting defendants where an entry of default judgment would risk inconsistent results.  Here, Allstate seeks declaratory judgment as to all Defendants based on the same legal and factual allegations.  The Court therefore **DENIES** Allstate's Motion for Default Judgment at this time but will permit the Motion's renewal upon an adjudication of the case on its merits.

### III.   CONCLUSION

For the reasons stated above, the Court **DENIES** Allstate's Motion for Summary Judgment [Doc. 33] and **DENIES** Allstate's Motion for Default Judgment [Doc. 30] until the time when this action is being adjudicated on the merits.

**IT IS SO ORDERED** this 26th day of June, 2013.

Amy Totenberg
United States District Judge